JOHN E. GREEN *vs.* FRED L. TARR.
SAME *vs.* WILLIAM H. NILES & others.

Essex.　November 3, 1910. — November 22, 1910.

Present: KNOWLTON, C. J., HAMMOND, LORING, SHELDON, & RUGG, JJ.

*Negligence,* Due care of plaintiff.

In actions by a boy twenty years of age against his employer and the owner of the building in which he worked, for personal injuries incurred while he was transporting himself and another employee of the defendant to an upper story of the building upon a freight elevator, which he found unemployed and which the defendant's employees were accustomed to use for their own transportation when not otherwise in use, it appeared that the plaintiff's injury was caused by the catching of his heel, which must have projected over a strip of wood about two and a half inches wide and two and a half inches high bolted to the edge of the platform of the elevator, that the platform was about five feet square, that the plaintiff told his companion to stand in the middle of it and that he stood facing

her a little way from her, that the plaintiff was relating to his companion his experience when he was at a theatre with a lot of other boys and a policeman took him by the arm and pulled him backward, and he testified that when he had reached this point in his story the accident happened. He also testified that a sudden jolt caused him to step backward to recover his balance and that the next thing that he remembered was that his foot was caught. It appeared that, whatever the vibration or jolting of the elevator was, it was something with which the plaintiff was perfectly familiar and that he knew the dangers which might result from this motion to a person who stood near the edge of the platform if he did not stand firmly, and in his testimony he failed to show that he was taking any care for his safety or giving any attention to his position upon the elevator in reference to putting his foot over the edge of the platform. The only person besides the plaintiff who saw the accident was his companion, who testified that the accident happened immediately after the plaintiff, in telling about the policeman, put up his hand and said, " Gee, but he gave me an awful rap," and that she did not notice whether his foot was on the joist or not or whether he had hold of anything. *Held*, that there was no evidence for the jury that the plaintiff was in the exercise of due care, and that a verdict properly was ordered for the defendant.

TWO ACTIONS OF TORT by the same plaintiff, one against his employer and the other against the owners of the factory building in Lynn in which the plaintiff was employed, for personal injuries sustained by him in October, 1903, when he was twenty years of age, while he was going from one floor to another on a freight elevator maintained in the factory building. Writs dated respectively January 16, 1904, and March 15, 1909.

In the Superior Court the cases were tried together before *Stevens*, J. At the close of the plaintiff's evidence, which is described in the opinion, the judge ordered a verdict for the defendant in each of the cases. The plaintiff alleged exceptions.

*J. H. Sisk*, (*R. L. Sisk & A. B. Tolman* with him,) for the plaintiff.

*R. Spring*, for the defendant in the first case.

*W. H. Niles*, for the defendants in the second case.

KNOWLTON, C. J. These are two actions, one against the plaintiff's employer and the other against the owners of the building where the plaintiff worked, to recover for an injury received by him while riding upon an elevator. The elevator was for the carriage of freight from the level of the street to the fifth floor and the intervening floors of the building. It was designed to take a load of three thousand pounds in addition to its own weight. Its rate of speed was from forty-five to fifty feet per minute. The platform was about five feet square. All these

facts were put in evidence by the plaintiff and were undisputed. There was testimony that signs were posted, bearing these words: "Take notice. For freight only. All persons riding on this elevator do so at their own risk." There was evidence tending to show that, when the elevator was not otherwise in use, employees often rode upon it without objection. At each floor there was a hatchway or plank floor in two parts, so arranged that it was opened and shut automatically by the elevator as it passed up and down, each part being lifted and rolled back upon a track under the floor by the elevator as it came in contact with it, and then returned to its place by the force of gravity after the elevator had gone by. At the edge of the platform, on the two sides of the elevator where the tracks for the hatches were located, there was a strip of wood about two and one half inches wide and two and one half inches high, bolted through the floor, to prevent anything carried on the elevator from going over the edge of the platform.

The plaintiff was about twenty years of age. He had come down the stairs from the fifth story on an errand, and was going back, when he saw the elevator standing at the first floor. He got into it, and invited Mrs. Nicholson, an employee whom he saw coming to her work late, to ride up with him. When both were on the elevator, he started it. As he was passing the fourth floor the heel of his foot was over the edge of the platform outside of the strip of wood two and a half inches high, bolted through the floor of the platform, and it caught upon some part of the surrounding structure and was injured. He and Mrs. Nicholson were the only persons who saw the accident.

When asked in his direct examination to state what happened, the plaintiff said: "As near as I can think, a sudden jolt; the elevator was then at the fourth floor. . . . Well, I said jolt; just the same as in an electric car if it stops sudden. I tried to catch myself and in catching myself I caught my foot." To the question: "What happened to you when the jolt came?" he answered: "Well, the next I remember, my foot was caught." He also said: "When I stepped backwards to catch myself and the jolt occurred, the next I remember was my foot caught and I yelled, and after I passed the beam, I suppose it came out itself. . . . The car stopped automatically at the fifth floor. I jumped

off the car. The car stopped even with the floor." He testified that he had ridden on the elevator a great many times during the months that he had worked there before the accident, and said that when he had ridden on it " it shook violently, but not as violently as it did the day I was hurt." Answering another question he said, " I meant that it shook strongly, as near as I can remember, all the time I was there." To the question: " Now then, what else did it do besides shaking strongly during the time you were there or any portion of the time ? " he replied: " Well, it jolted and seemed to jolt sideways the day I got hurt. . . . On the day of the accident when it vibrated so strongly it did not shake me off my feet. It did not shake the position of my body that I remember of, so that in all the vibration that I have described there was not vibration enough to disturb my standing up without holding on to anything."

Mrs. Nicholson, called by the plaintiff, testified in part as follows: " Green told me to stand in the middle and he stood facing me, I do not know how far from the edge but a little way from me. There was a conversation. Green was standing right in front of me. I do not know where he stood in regard to the post. He was talking to me. I did not notice anything different from any other time I was on the elevator. There was no more vibration on this elevator than on any other one that I noticed. The first thing I knew I heard John pleading for me to stop the elevator, and I said, ' I don't know, what will I do ? ' and I began screaming, and after that I cannot tell. . . . I do not know just how he was caught. . . . The elevator went on up. I got out on the top floor."

In cross-examination she testified that Green was telling her something that happened to him with a lot of other boys in the Lynn Theatre, when a policeman on duty called out for them to move on, or something like that. She said, " I think Green did say ' Gee, but he gave me an awful rap.' The accident happened right after he said ' Gee, but he gave me an awful rap.' He put up his hand before the accident happened and that is my best recollection. The time he put his hand up was when he said ' Gee, but he gave me an awful rap.' . . . I did not notice whether his foot was up on the board joist or not. I stood all the time without supporting myself. I do not know whether

my arms were folded or hanging at my side. I did not take
hold of anything. I did not notice as he was talking that he
had hold of anything. I stood firm. There was no more shak-
ing or vibration than I noticed in other cars. I did not notice
any vibration at all. . . . I did not notice that the elevator had
slowed down or started up with a jerk. I do not know whether
I would have noticed it if there had been a slow movement and
then it had shot up fast. I did not notice anything of that
kind."

In her testimony there is nothing to indicate that the plaintiff
was free from negligence that contributed to the injury. If
he can stand on this part of the case, it must be on his own
testimony.

He testified that he knew there was danger if one got too near
the edge of the platform, and that there was a risk of injury if
one's foot got over the edge. The vibration or jolting of the
elevator was something with which he was very familiar. Al-
though he testified that it seemed greater that day than before,
all the experts that he called testified to nothing in the condition
of the elevator that could produce any irregularity, except a
wearing of the gearing that might cause vibration. He testi-
fied that at the time of the accident "the elevator kind of wav-
ered; it did not stop, it slowed down for a fraction of a minute.
It never stopped permanently. I could not say how long the
car travelled with the speed reduced. The elevator started up
when it was going through the floors. I was not thrown when
the elevator slowed down. I could not say whether the elevator
travelled ten feet or twenty feet; I have no idea. . . . When I
say it started faster I mean it went faster than when it was going
slow. . . . It did not slow down so perceptibly that I noticed
that the elevator was not acting as it was accustomed to act. It
did not go slow enough to do that. It did not slow down but
very little, — barely perceptible. . . . I do not remember whether
I threw my hands out. I do not remember that my body was
swung to and fro. I have not the slightest recollection to-day
as to what motion was imparted to my body by the moving up of
the elevator. I saw the young lady that I was telling my story
to at that time. She was not thrown. I did not see any signs
of movement of her body. The motion of the car after it slowed

down was to increase its speed going up again.  I cannot tell the jury how the speed, after the elevator slowed down, compared with the ordinary running of the car.  I cannot give the jury the slightest idea. . . . At the time of the upward movement of the elevator, my left heel got over a piece of joist two inches high; I do not know where my heel caught. . . . I do not know where my right foot went.  I have no recollection that it stirred from the position it was in. . . . I do not know how long the increased motion of the car lasted.  I cannot describe any motion of my body which was imparted to me by the elevator at the time of the accident.  I do not remember stepping backwards just before the accident. . . . When I had ridden on the elevator before it did make a rumbling noise and shake as it struck the hatches.  As I remember it the accident happened just before the bottom of my car reached the level of the fourth floor, and as the car came up toward that fourth floor the top of it struck the hatches and that caused a little additional vibration.  It always did every time I rode on it.  I believe it always shook a little more when the top of the car struck the hatches."

At the time of the accident the plaintiff was still talking to Mrs. Nicholson of his experience with the policeman.  He testified of the policeman : " ' He did not strike me on the head; he took me by the arm ; he pulled me backwards' and that is the point in my story I had reached when the accident happened as near as I can remember."

We are of opinion that the testimony of the plaintiff, whether taken by itself or in connection with testimony of Mrs. Nicholson, has no tendency to show that he was in the exercise of such care as was reasonably necessary in reference to keeping his feet from going beyond the edge of the platform.  The vibration or jolting of the elevator, whatever it was, was something with which he was perfectly familiar.  He well knew the dangers that might attend it to one who stood near the edge of the plaform, if he did not stand firmly.  In his testimony he failed utterly to show that he was taking any care for his safety or giving any attention to his position upon the elevator, in reference to the possibility of putting his foot over the edge of the platform.  If there is a possibility that he was using ordinary care, he offered no evidence to show the probability of it.  We can hardly conjec-

ture that the accident happened without contributory negligence on his part; much less can we find in his testimony that which tends to establish as a fact the proposition that he was in the exercise of reasonable care. The only reasonable explanation of the accident, upon his testimony and that of the other witness, is that he was not exercising such care as persons ordinarily would exercise in his place, with his experience upon the elevator. We are of opinion that he failed to introduce any evidence that would warrant the jury in finding that he was in the exercise of due care. In each case the entry must be

*Exceptions overruled.*